**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**COOKEVILLE DIVISION**

LARRY THOMPSON,          )
                         )
      Plaintiff,       )
                         )
vs.                  )     No. 2-03-0079
                         )     JUDGE HAYNES
DACCO, INC.,             )
                         )
      Defendant.     )

## M E M O R A N D U M

Plaintiff, Larry Thompson, filed this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., against the Defendant, Dacco Incorporated, his former employer. Plaintiff asserts a claim for damages for injuries due to a racially hostile work environment created by racial graffiti in a restroom in his work area at the Defendant's plant. The parties engaged in discovery and in earlier proceedings, the Court denied the Defendant's motion for summary judgment. (Docket Entry No. 58). After that ruling, additional discovery was undertaken.

Before the Court is the Defendant's second motion for summary judgment (Docket Entry No. 98); Plaintiff's motion for summary judgment (Docket Entry No. 102) and the Defendant's motions in limine (Docket Entry Nos. 125 and 126). The Defendant's motions in limine address the Plaintiff's proof at trial. With the additional discovery and the motions in limine, the Court reviews its earlier decision on whether the Plaintiff's proof is sufficient to support a judgment on his claim.

In its second motion for summary judgment (Docket Entry No. 98) that cites additional discovery, the Defendant contends, in sum: (1) that the Defendant promptly responded to Plaintiff's complaints of racial graffiti at its workplace; (2) that the Defendant announced its intention to terminate any employee who wrote such graffiti; (3) that the Defendant secured an agreement with

the union for such terminations; and (4) that the Defendant promptly and actively investigated the incidents, culminating in the immediate termination of the offending employee.

In his motion for summary judgment, Plaintiff contends that there were fourteen incidents of highly inflammatory racially based graffiti and other remarks and that beyond its written policy, Defendant's response to these offensive remarks was to paint over the offensive graffiti. In Plaintiff's view, such a response did not reasonably address his complaint of racially hostile work environment.

In its motions in limine, the Defendant seeks to exclude, as hearsay, the Plaintiff's reliance on the Equal Employment Opportunity Commission ("EEOC") investigator's report of interviews with the Defendant's current and former employees. The Defendant also seeks exclusion of the EEOC's probable cause letter on the Plaintiff's administrative charge that the EEOC investigated. The Defendant also seeks to exclude as hearsay, Plaintiff's testimony about graffiti at its plant prior to his employment with the Defendant and Plaintiff's testimony about an unknown union agent's statement concerning additional graffiti that Plaintiff did not observe, after DACCO terminated the employee whom DACCO identified as the source of the racial graffiti.

Of the pending motions, the Court addresses first, the Defendant's motions in limine. The rulings on those motions may impact the Plaintiff's proof on the pending motions for summary judgment and at trial.

### A. Analysis of the Motions

### 1. The Defendant's Motions In Limine

As to the Defendant's motion to exclude the EEOC investigator's report, in his witness list for trial, Plaintiff list two witnesses, himself and Paul Adkins (Docket Entry No. 127). On his

2

exhibit list, Plaintiff lists documents, including the EEOC's reasonable cause letter and the EEOC's investigator's report. (Docket Entry No. 128). The Defendant contends that the EEOC investigator's report is hearsay and the Court possesses the discretion to exclude EEOC's probable cause letter. The Defendant's second motion concerns Plaintiff's testimony about additional graffiti that Plaintiff did not personally observe, but heard about from other employees, some of whom are not identified.

Plaintiff responds that the EEOC investigator's report is a finding of a governmental entity and is not hearsay and that the Court has the discretion to admit the EEOC's probable cause letter. Plaintiff also argues that his proof should not be limited to graffiti that he personally observed.

Filings in the administrative process of the EEOC may be admitted into evidence at trial, subject to the requirements of Fed. R. Evid. 803(8)(C). Chandler v. Roudebush, 425 U.S. 840, 863 n.39 (1976). In this Circuit, whether to admit an EEOC letter of probable cause is within the Court's discretion. Heard v. Mueller, 464 F.2d 190, 194 (6th Cir. 1972). As to the investigator's report, those reports have been excluded on essentially two grounds: the proof in the report is otherwise available, Tulloss v. Near N. Montessori Sch., Inc., 776 F.2d 150, 153, 154 (7th Cir. 1985) or the investigator's report is unreliable as based upon hearsay statements. Stolarczyk v. International Freight, LLC, 376 F.Supp. 834, 838 (N.D. Ill. 2005).

Of the EEOC's filings, only two are at issue, the letter and the EEOC's investigator's report. On the EEOC's probable cause letter, this Court considers whether, on the facts of the particular action, the EEOC letter would aid the jury. Here, the facts giving rise to Plaintiff's claims are not complex and the nature of the discriminatory conduct is obvious. This Court does not discern how the EEOC letter finding probable cause will aid to the jury that will have to evaluate the proof on a higher standard than probable cause. Thus, the EEOC probable cause letter is excluded.

3

As to the EEOC's investigator's report, the Defendant argues that the report is based upon interviews of other persons and constitutes hearsay. Plaintiff argues that the investigator's report is a finding of a governmental entity under Fed. R. Evid. 803(8)(C) and is trustworthy. From the Court's review, this report contains "notes" on the EEOC's investigator's interviews and are not "findings" of the EEOC. In addition, these interview notes contain many general statements that could only be clarified by discovery and cross-examination. There has been ample time for discovery. Here, there is not any showing of the unavailability of the witnesses or documents identified in the investigator's report to the Plaintiff for discovery or trial. Thus, the Court concludes that the EEOC's investigator's report should be excluded, but may be used for impeachment purposes for any witness who testifies, subject to relevancy determinations.

As to the Defendant's second motion in limine, from the Court's review of Plaintiff's papers, this motion is limited to Plaintiff's testimony about events that Plaintiff did not observe. Absent a more specific question and/or witness, this motion is granted as such testimony by the Plaintiff about statements of other persons generally would be hearsay. To be sure, for Plaintiff's claim, the Court must consider the totality of the circumstances, but these motions address how to prove the totality of the circumstances.

Accordingly, the Court will not consider the excluded matters covered by these motions on the parties' motions for summary judgment, consistent with these rulings. See Fed. R. Evid. 56(e) limiting consideration of evidence on a motion for summary judgment to admissible evidence.

## 2. The Parties' Motions for Summary Judgment

4

## a. Findings of the Fact[1]

Thompson, an African American, was, at the time of the events at issue, an employee with the Defendant for three years. From May 2 to July 17, 2002, Thompson describes multiple incidents of racially offensive graffiti in the restroom in his work area and some of these writings were directed at him. (Docket Entry No. 29, Attachment thereto Thompson Deposition at 14, 51 and Docket Entry No. 46, Attachment thereto Defendant's Response to Plaintiff's First Requests for Admission at ¶¶ 2, 4, 27, 28, 30, 37). Thompson was the only African American employee on second shift when these incidents occurred. (Docket Entry No. 29, Attachment thereto Thompson Deposition at pp. 16-17).

It is undisputed that twelve incidents of racial graffiti occurred in the men's restroom and during an eleven week period from May 2, 2002 to July 17, 2003. (Docket Entry No. 46, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶ 4). This graffiti included the phrases such as "KKK is getting bigger Hit a Nigger with a stick," "Do not paint over any more boy." Some of these writings specifically named Thompson, such as: "LT is a faggot" "LT f____ farm animals and nigger p_____." Id. at ¶ 46. Thompson reported three of these writings to his supervisor and other writings were reported to Plaintiff by other employees whom he knew. Id.

Thompson who knows most of his forty or so co-workers on his shift, was surprised by this

_____

[1]Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). The Court concludes that under the applicable law, there are not any material factual disputes. Thus, this section constitutes finding of facts under Fed.R.Civ.P. 56(d).

5

graffiti. (Docket Entry No. 100, Thompson's deposition at p. 15) as he has not had any trouble with his co-workers, id. at 32, nor encountered any racially offensive comments. Id. at 55-56. Thompson was "surprised" one of his co-workers wrote the graffiti because prior to May 2, 2002, he did not believe his co-workers "were capable" of such acts. Id. at pp. 14-15. Thompson's co-workers told Thompson that they were troubled with the graffiti. Id. at pp. 11, 17, 86. Thompson agreed that his supervisor did not want the graffiti "to be taking place," and was frustrated by his inability to identify the perpetrator. Id. at p. 77.

As to the graffiti incidents, according to Thompson, he first complained to David Birdwell, his supervisor who responded "I'll take care of it." Id. at 12. Birdwell painted over the offending graffiti. Thompson considered that with painting over the graffiti, Birdwell "did the right thing." (Docket Entry No. 110, Thompson's Deposition at 14). Birdwell and members of DACCO's maintenance staff painted over the subsequent graffiti writings as well. (Docket Entry No. 111, Birdwell deposition at 15; White deposition at pp. 19-20). Thompson agreed that painting over the graffiti was the appropriate thing to do and Thompson thanked Joe White, DACCO's Operations Manager, for doing so. (Docket Entry No. 100, Thompson deposition at pp. 13, 51, 92; White deposition at 44).

After the first graffiti incident, Birdwell also conducted a "face-to-face" meeting with each employee on Thompson's shift advising that DACCO does not tolerate this type of behavior. (Birdwell deposition at pp. 15, 29-30). These meetings took place the same day that Thompson first reported the graffiti. Id. Thompson considers Birdwell to be a good supervisor whom Thompson described as "fair to me." (Docket Entry No. 111, Thompson's deposition at p. 7).

After the second graffiti appeared, Birdwell also informed White, his supervisor and also told

Thompson to talk to White on how to end this graffiti writing. (Birdwell deposition at p. 17). The next morning, White instructed Clarence Carnahan, DACCO's maintenance supervisor, to monitor the bathroom to identify the perpetrator and submit daily reports. (White deposition at pp. 20-21).

Birdwell also inspected the restroom "from time to time," including before Thompson's shift to ensure that the responsible person did not work on first shift. (Birdwell deposition at pp. 30-31).

After this second incident, Birdwell also discussed with Thompson how to handle the matter. (Docket Entry No. 100, Thompson's deposition at 21-22). Thompson requested that Birdwell to talk to all employees, but does not know if Birdwell did so. Id. at 22. Thompson also reported the second incident to Swallows, the company's human resources manager. Id. at 24.

Within a week of White's awareness of the graffiti, White and Jerry Swallows, DACCO's human resource manager, met with Mike Scott, the union's president and the union's bargaining committee. (White deposition at 22, 24). White explained that with the collective bargaining agreement and the termination consequence for the offending employee, White elected to approach the union representatives. White reviewed DACCO's anti-harassment policy and informed the union officials that DACCO would terminate the person responsible for the graffiti. White solicited the union bargaining committee's assistance in identifying the perpetrator and in preventing recurrences of the graffiti. (White deposition at p. 22).

Scott announced to the union membership that DACCO would terminate any person found responsible for writing this graffiti and that the union would not defend the responsible party. (White deposition at p. 26; Swallows deposition at p. 76; Thompson deposition at pp. 89-90; Scott Affidavit at ¶ 2). White and Swallows reported to Scott on the status of DACCO's investigation until the employee was identified and terminated. (White deposition at p. 36).

7

White and Swallows also met with DACCO's entire supervisory staff after White became aware of the graffiti. (White deposition at p. 22). The supervisory staff was comprised of Donnie Ragland, Ronnie Brown, Tim Mellon, Jerry Ward, Anthony Grogan, David Birdwell, and Clarence Carnahan. (White deposition at p. 27). In this meeting, White reviewed the graffiti incidents reminded the supervisors of DACCO's policy that does not tolerate this behavior and solicited the supervisors' help in identifying the perpetrator. (White deposition at p. 27). DACCO trains its supervisors on how to enforce its anti-harassment policy. (Swallows deposition at pp. 9, 36).

Upon hiring, DACCO employees are provided with a copy of DACCO's Anti-Harassment Policy and are required to acknowledge receipt of that policy in writing. (White deposition at p. 27). DACCO's policy is also displayed at its facility. Id. At some point in July, 2003, at the company meeting, Thompson signed a copy of the company's anti-harassment policy. (Docket Entry No. 100, Thompson's deposition at 44-45 and at Exhibit 4 thereto). Meetings are held at a restaurant where "the area supervisor comes in to have a meeting with the employees maybe three times a year for sexual and racial harassment. It's part of policy." Id. at 45.

After the June 14th incident, Thompson asked White for a transfer, but the union rules posed a problem. (Docket Entry No. 100, Thompson's deposition at Vol. II at p. 29). Thompson later successfully bid for a transfer Id. at Vol II at p. 28. White and Thompson discussed the status of DACCO's graffiti investigation on "several occasions," with Plaintiff suggesting that DACCO "take this thing public" and discuss the situation with the entire workforce. (White deposition at pp. 40-41 and Thompson deposition at pp. 93-94). In a meeting of White and Thompson on June 14, 2002, Thompson was concerned about his reaction if he discovered who wrote the graffiti. (White deposition at pp. 39-40 and Thompson deposition at p. 92). White asked Thompson to calm down,

8

citing DACCO's progress with its investigation. (White deposition at p. 40).

In one meeting, White and Swallows assert that they discussed three options with Thompson: (1) conducting a plant-wide meeting to discuss the graffiti; (2) post a discussion of the graffiti; or (3) continue with the investigation, given that DACCO "had narrowed the suspects considerably." (Swallows deposition at 24-25, White deposition at 40-43). Thompson did not recall this meeting, but would not doubt White's testimony, (Docket Entry No. 100, Thompson's deposition at Vol. II at pp. 11-12 and conceded that White and Swallows told him the bathroom would be monitored. Id. at pp. 12, 21. Thompson suggested monitoring the bathroom to identify perpetrator and DACCO agreed. (White deposition at pp. 41-42). Thompson stated that "if too much information was put out, they might not find the responsible person." (Thompson deposition at pp. 101-104). Thompson thanked White for DACCO's efforts. (Thompson deposition at pp. 9 1-93).

Donnie Ragland and Clarence Carnahan monitored the restroom where the graffiti was written because both employees frequently worked in and around that restroom area and their presence would not "be observed [by the perpetrator] as unusual." (White deposition at p. 28). Approximately 280 persons, including the forty employees on Thompson's shift, have access to the twelve (12) restroom stalls in the area where Thompson works. (Swallows deposition at p. 68). Carnahan and Ragland inspected the restroom daily before and after shift changes, breaks, and lunch as well as conducting random inspections, until DACCO identified the perpetrator. (White deposition at pp. 29-30). White met with Ragland and Carnahan regularly throughout this time. (White deposition at p. 32).

DACCO's investigation determined that graffiti had to be written between the first and second shift, (White deposition at p. 32) and DACCO compiled a "list of individuals . . . that

9

frequented the restroom during those particular times," and that list identified "about half a dozen individuals." Id. Eventually, the list was narrowed to two suspects — one of whom was later apprehended. Id.

On July 17, 2002, graffiti appeared in the bathroom at 6:55 a.m. and was painted over immediately. (Swallows Affidavit at ¶ 10). A few hours later, Carnahan and Ragland observed one of the suspected perpetrators enter the bathroom at approximately 10:07 a.m. Id. at ¶ 10; Swallows deposition at pp. 49-51; deposition of Donnie F. Ragland at p. 24). Certain that graffiti was not on the wall at this time, Ragland checked the wall after this employee left and discovered new graffiti on the restroom wall. (Ragland deposition at pp. 24. 26). As this employee exited, Ragland and Sheffield confronted the employee, John Montgomery, and escorted him to the conference room, where Swallows questioned him. (Swallows Affidavit at ¶ 11; Swallows deposition at pp. 49-51; Ragland deposition at p. 26; Plaintiff's depositionat pp. 84-85.

Montgomery denied writing the graffiti, but Swallows instructed him to empty his pockets and the type of marker used to write the graffiti was in Montgomery's pocket. (Swallows Affidavit at ¶ 12; Swallows deposition at pp. 49-51). Montgomery then admitted only to rubbing the paint off the wall while it was wet, but denied writing on the wall. (Swallows deposition at pp. 49-51). Swallows immediately terminated Montgomery and DACCO informed Thompson that it caught the employee responsible for the graffiti and terminated him. (Swallows Affidavit at ¶ 13). Thompson was "pretty much" "surprised" that Montgomery was the offending employee. (Docket Entry No. 110, Thompson's deposition, Vol. II at p. 27). Thompson told the EEOC that after Montgomery was terminated, he did not see any more graffiti. Id.

Thompson's basic point in this action is that Montgomery was not identified "soon enough."

10

<u>Id.</u> at Vol. II at p. 23. Yet, Thompson conceded to the EEOC that he may have made the comment to his employer that "you may want to wait a while and see if you catch the person." <u>Id.</u> at Vol. II p. 46 at Exhibit 5 thereto. At different points in his deposition, Thompson testified on the adequacy of DACCO's response to the graffiti incidents as follows:

> Q. Did you ever — around this time, around May 17 to May 20, do you remember telling Joe White that you appreciated what the company was doing to catch this guy
>
> A. Trying to catch the guy?
>
> Q. Yeah.
>
> A. Yeah, painting over the bathrooms, yeah, the words. Yeah, I thanked him for it.
>
> Q. You also thanked him for the efforts that he was using to try to find and try to discover the identity – –
>
> A. What efforts was that?
>
> Q. They told you about them, didn't they? What?
>
> A. What?
>
> Q. That they were keeping a watch over the bathroom, that they were trying.
>
> A. Well, yeah, they should.
>
> Q. And they were doing what they should have done to try to catch the guy, weren't they?
>
> A. As for as I know.
>
> &ast; &ast; &ast;
>
> Q. What do you recall?
>
> A. <u>That we would just wait and see, you know, catch who was do it.</u>

11

| Q. | <u>And that's what you wanted to do?</u> |
|----|------------------------------------------|
| A. | Yes. |
| Q. | You would rather wait and see and quietly get the guy than make some production in front of the entire shift? |
| A. | I guess? |

(Docket Entry No. 111, Thompson's deposition at 32-33 and 35-36).[2] (emphasis added).

## 2. Conclusions of Law

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment <u>sua</u> <u>sponte</u>, so long as the opposing party was on notice that she had to come forward with all of her evidence." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986).

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment `shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law</u>

---

[2]The page reference are to the Clerk's pagination after filing and are located in the lower right corner of the Docket Entry Number for that filing.

will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in Celotex

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact.

13

Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrating the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that

> The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.'

Street, 886 F.2d at 1480 (cites omitted). See also Hutt v. Gibson Fiber Glass Products, No. 89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment must determine `whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting Liberty Lobby)).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is `genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

14

\* \* \*

      Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- `whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'</u>

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that

      [I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: `The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Company</u>, 791 F.2d. 43, 46 (6th Cir. 1986) <u>app.</u> 840 F.2d 16 (6th Cir. 1988) (unpublished opinion) (citation omitted).

      The Court of Appeals further explained the District Court's role in evaluating the proof on a summary judgment motion

      A district court is not required to speculate on which portion of the record the

15

nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rule 8(b)(7)(A) and (C) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

1.      Complex cases are not necessarily inappropriate for summary judgment.

2.      Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3.      The movant must meet the initial burden of showing `the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4.      This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.      A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must

16

prevail as a matter of law.'

6.       As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.       The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.       The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.       The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.       The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

Title VII claims for a hostile environment claims is governed by Harris v. Fork Lift Systems, Inc., 510 U.S. 17, 21-22, 23 (1993), but the offensiveness of these racial graffiti writings is not

17

contested here. Rather, the issue in this action is the adequacy of the Defendant's response to these racially offensive graffiti writings. Thus, for DACCO's liability, the issue is whether Plaintiff can establish that DACCO knew or should have known about the graffiti and failed to take prompt and appropriate remedial action.

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence···· The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). Accord Jackson v. Quanex Corp., 191 F.3d 647, 659 (6th Cir. 1999); Blankenship v. Parke Care Centers. Inc., 123 F.3d 868, 872 (6th Cir. 1997) ()

As the Sixth Circuit stated in Jackson, once a hostile environment is established, the Title VII plaintiff "must then prove that [his] employer "tolerated or condoned the situation" or "that the employer knew or should have known of the alleged conduct and failed to take prompt remedial action." 191 F.3d at 659 (quoting Davis v. Monsanto Chem. Co., 858 F.2d 345, 349 (6th Cir. 1988)). "The act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment." Blankenship, 123 F.3d at 872.

In this context, legal distinction must be made between the acts of a co-worker and a supervisor as Blankenship described:

> In defining the employer's duty in the present case, we must keep in mind that the alleged harasser was not plaintiff's supervisor. When the harasser is a co-worker, the

18

standard for determining employer liability is "markedly different" from that applicable to supervisors, and is not based upon the doctrine of *respondent superior*. As discussed above, the employer is being held directly responsible for its own acts or omissions. Thus, when an employer responds to charges of co-worker sexual harassment, the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employers knew or should have known. The act of discrimination by the employer in such a case is not the harassment, but rather the inappropriate response to the charges of harassment.

Id. at 873 (emphasis added with citation omitted).

As the Sixth Circuit clearly stated in Fleenor v. Hewitt Soap Co, 81 F.3d 48, 50 (6th Cir. 1996) (citation omitted), an employer's liability for a co-workers's acts turns on its "failure-to-correct after notice or duty to act after knowledge of harm." In a word, an employer can avoid liability for co-worker harassment if the employer's response "is reasonably calculated to end the harassment." Jackson, 191 F.3d at 663.

The undisputed facts here are that DACCO's has a policy of zero tolerance for workplace harassment. DACCO published its anti-harassment policy at the work-site upon their hire and annually. (Swallows Affidavit at ¶ 14). Prior to these incidents, Thompson had not experienced any racially offensive incidents and was surprised by the racial graffiti.

As to DACCO's remedial measures after the appearance of this racially offensive material, it is undisputed that Bridwell promptly painted over first the graffiti and Plaintiff agreed that this was the "right thing" to do. Birdwell met with each employee of Plaintiff's shift and informed them that this type of graffiti would not be tolerated. (Birdwell deposition at pp. 15, 29-30). After the second graffiti incident, White, DACCO's plant manager, also informed Union officials, that the responsible employee would be terminated and the union officials agreed. DACCO's officials monitored the restroom before and after shift changes, breaks, and lunch to identify the perpetrator. DACCO

discussed with Thompson the type of investigation and Thompson agreed to the monitoring of the restroom. Thompson was informed of the status of the investigation. Thompson conceded that the nature of the conduct posed difficulty in identifying the perpetrator. (Thompson deposition at pp. 93-94). The undisputed fact is that about 2800 employees work at DACCO's plant and 40 or more work at Thompson's work site utilize this restroom area. Thompson acknowledges the difficult task that DACCO faced in identifying this person. (Thompson deposition at pp. 14-15).

After about eight to nine weeks after the first incident, DACCO identified and terminated the perpetrator immediately after identifying him. Thompson told the EEOC that the graffiti stopped after Montgomery's termination. Prior to the graffiti writings, Plaintiff had not experienced any racial harassment. Thompson was surprised that Montgomery engaged in racial graffiti because Thompson described Montgomery as a quiet person who performed his job. Plaintiff did not have any "suspicions whatsoever" as to who was responsible for the graffiti. There is a reference to another racial slur about a Polish employee after the employee who wrote the graffiti about Plaintiff was terminated, but even if proved, that fact does not undermine the reasonableness of the Defendant's response to Plaintiff's complaints.

DACCO's response is more extensive than in those decisions where the employer's response was found inadequate. In Jackson, 191 F.3d at 651, the employer ignored numerous reports of harassment over a period of several years and racial slurs were made in supervisors' presence. The employer in Jackson did not punish those responsible for racial harassment and graffiti for a period of at least two years. Id. at 652. In Jackson, despite its awareness of harassment, the employer was "slow to eliminate racially offensive graffiti when it learned of it, and made no effort to discover the

perpetrators." Id. at 663.

In sum, the Court concludes that from Plaintiff's proof, a jury could conclude that Thompson is a member of a protected class; that a racially hostile work environment was created in Plaintiff's work area by a co-employee and that Plaintiff suffered emotional injury due to that harassment. . Yet, Title VII precedents require that to be liable under Title VII, Plaintiff also had to prove that DACCO failed to respond in a reasonable and prompt manner to eliminate the harassment of Plaintiff by his co-worker(s). The undisputed facts reflect that DACCO promptly responded in a reasonable manner with which Plaintiff agreed. Plaintiff acknowledges the difficult task that DACCO faced in identifying this person, given the number of persons who had access to this room.. Within two and a half months, the Defendant's efforts culminated in the identification of offending employee who was terminated on the spot. Thompson has not cited any proof of alternative measures that would have disclosed the offending employee earlier than DACCO did. Under the undisputed facts here, Plaintiff has not shown the Defendant's response to these events to be unreasonable or untimely.

Accordingly, the Plaintiff's motion for summary judgment (Docket Entry No. 102) should be denied and the Defendant's motion for summary judgment (Docket Entry No. 98) should be granted.

An appropriate Order is filed herewith.

**ENTERED** this the ___19th___ day of July, 2006.

WILLIAM J. HAYNES, JR.
United States District Judge

21